No. 85–5141. DeGarmo *v.* Texas. Ct. Crim. App. Tex. Certiorari denied.

Justice Brennan, with whom Justice Marshall joins, dissenting.

In *Gregg* v. *Georgia*, 428 U. S. 153 (1976), six Justices concluded that a capital sentencing scheme that directs and limits the jury's discretion minimizes the risk of arbitrary and freakish imposition of the death penalty and thereby cures the defects that led the Court in *Furman* v. *Georgia*, 408 U. S. 238 (1972), to invalidate capital punishment as unconstitutionally cruel and unusual. I dissented in *Gregg* because I do not believe that the unconstitutionality of capital punishment depends upon the procedures under which the penalty is inflicted. In my view, the constitutional infirmity in the punishment of death is that "it treats 'members of the human race as nonhumans, as objects to be toyed with and discarded'" and is thus "'inconsistent with the fundamental premise of the [Eighth Amendment] that even the vilest criminal remains a human being possessed of common human dignity.'" *Gregg, supra,* at 230 (Brennan, J., dissenting) (quoting *Furman* v. *Georgia, supra,* at 273).

I have adhered to this view that capital punishment is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. I do so again today. But even if I agreed that capital punishment is constitutional if imposed in a rational and nondiscriminatory manner, I remain convinced that the Court deludes itself when it insists that the infliction of the death penalty, as currently administered, is not

arbitrary or capricious under any meaningful definition of those terms. See *Pulley* v. *Harris,* 465 U. S. 37, 59 (1984) (BRENNAN, J., dissenting). This case demonstrates just one way in which capital sentencing schemes have failed to eliminate arbitrariness in the choice of who is put to death.

With the aid of Helen Mejia, Roger DeGarmo kidnaped and murdered a young woman. DeGarmo was subsequently convicted of capital murder and condemned to die by lethal injection. As part of a plea bargain, Mejia—whose participation made her equally subject to prosecution under the capital murder statute—received a sentence of only 10 years' deferred probation. In other words, while the State sought and may soon succeed in putting DeGarmo to death, it did not care to see his accomplice serve even a day in jail for participating in the same offense. This gross disparity in treatment is solely a product of the prosecutor's unfettered discretion to choose who will be put in jeopardy of life and who will not.*

I believe that such a disparity in treatment is alone sufficient grounds to set aside DeGarmo's death sentence as disproportionate under the circumstances. Cf. *Pulley* v. *Harris, supra,* at 43; *Solem* v. *Helm,* 463 U. S. 277 (1983). More importantly, however, this disparity in treatment highlights the utter failure of the elaborate sentencing schemes approved by the Court in *Gregg* and its companion cases to meaningfully limit the arbitrary infliction of

---

*Although Mejia testified for the State at trial, the prosecutor's decision to let her go free was not needed to obtain DeGarmo's conviction. Mejia's plea and sentence were not entered until over 18 months after DeGarmo's trial. On appeal, DeGarmo alleged that the State had offered this remarkably lenient deal to Mejia *before* his trial to persuade her to testify. DeGarmo argued that the prosecutor's failure to disclose this promise violated his right to have the agreement disclosed to the jury. See *Giglio* v. *United States,* 405 U. S. 150 (1972). The State responded that the agreement to let Mejia off on probation was made after DeGarmo's trial and that, at the time of the trial, Mejia was promised only that she would not be prosecuted for capital murder. Without a hearing and based solely on the record on appeal, the Texas Court of Criminal Appeals accepted the State's version of the facts. Of course, DeGarmo may raise this claim again in federal habeas proceedings, and, if the district judge so orders, may obtain a hearing to show that such was not the case. See 28 U. S. C. § 2254(d). However, in the absence of contrary findings, I accept the conclusions of the state court. Based on these facts, the decision not to seek at least imprisonment for Mejia while seeking the death penalty for DeGarmo is puzzling.

death by the States. When *Gregg* was decided several Members of the Court expressed the belief that channeling juror discretion would minimize the risk that the death penalty "would be imposed on a capriciously selected group of offenders," thereby making it unnecessary to channel discretion at earlier stages in the criminal justice system. See *Gregg, supra,* at 199 (opinion of Stewart, POWELL, and STEVENS, JJ.). But discrimination and arbitrariness at an earlier point in the selection process nullify the value of later controls on the jury. The selection process for the imposition of the death penalty does not begin at trial; it begins in the prosecutor's office. His decision whether or not to seek capital punishment is no less important than the jury's. Just like the jury, then, where death is the consequence, the prosecutor's "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U. S., at 189.

Instead, the decisions whether to prosecute, what offense to prosecute, whether to plea bargain or not to negotiate at all are made at the unbridled discretion of individual prosecutors. The prosecutor's choices are subject to no standards, no supervision, no controls whatever. There are, of course, benefits associated with granting prosecutors so much discretion, but there are also costs. Some of these costs are simply accepted as part of our criminal justice system. But if the price of prosecutorial independence is the freedom to impose death in an arbitrary, freakish, or discriminatory manner, it is a price the Eighth Amendment will not tolerate. I dissent and would grant the petition in order to vacate the sentence below.