(No. 63024.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MILTON JOHNSON, Appellant.

*Opinion filed December 21, 1987.—Rehearing denied February 2, 1988.*

120

SIMON, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Gary S. Rapaport, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart, Solicitor General, and Mark L. Rotert and Kenneth A. Fedinets, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Milton Johnson, was indicted in the circuit court of Will County for four counts of murder and four counts of felony murder in violation of sections 9—1(a)(1)

and 9—1(a)(3), respectively, of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(3)). He was tried by a jury and found guilty on all eight counts. At a separate bifurcated sentencing hearing, as to which defendant waived his right to a jury, the trial court found that the necessary aggravating factors existed, and that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. The court thereupon sentenced defendant to death on each of the felony-murder convictions. No sentence was pronounced as to the four murder convictions. Defendant's post-trial motion was denied, and he brings a direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603), alleging numerous errors at all stages of the proceedings.

The evidence adduced at trial reveals that on August 20, 1983, four women were murdered in the "Greenware by Mary" ceramic shop, located on East Cass Street in Joliet, Illinois. Three of the victims, 29-year-old Pamela Ryan, 38-year-old Barbara Dunbar, and 46-year-old Marilyn Baers, the owner of the ceramic shop, sustained multiple stab wounds which caused their death. The fourth victim, Anna Ryan, age 75, was stabbed and shot to death.

The first issue we address is whether defendant knowingly and effectively waived his right to counsel during the guilt phase of the trial.

The record reveals that on August 16, 1984, defendant appeared for his arraignment without counsel. The trial court furnished him with a copy of the indictment, which set forth the nature of the charges. Defendant waived reading of the indictment, stating that he was "familiar with it." At his request, the court then set a new date for the arraignment to allow defendant additional time in which to secure private counsel.

On September 13, 1984, defendant appeared in court represented by his counsel, William Swano. Mr. Swano waived formal reading of the indictment, and entered defendant's plea of not guilty to each of the charges.

Approximately two months later, defendant's counsel filed a motion for leave to withdraw because of defendant's inability to pay his legal fees. During the December 19, 1984, hearing, the trial court initially denied the motion, indicating that defendant's inability to compensate Mr. Swano in accordance with their prior agreement was an insufficient basis upon which to permit Mr. Swano leave to withdraw. However, defendant then personally addressed the court, stating that he wished to have his counsel "dismissed" from the case because he would not receive "true legal representation by an attorney who isn't being paid for his services."

Defendant further advised the court that he would prefer not to be represented by the public defender's office, and specifically requested the court not to appoint the two assistant public defenders who represented him in a previous murder trial. Defendant indicated that he would be "more than satisfied" if the court appointed Mr. Andreano of the public defender's office to represent him. Accordingly, the court granted Mr. Swano leave to withdraw, and appointed Mr. Andreano to represent defendant.

On September 30, 1985, the date upon which the trial was scheduled to proceed, defendant orally advised the court that he no longer wished to be represented by Mr. Andreano and the assistant public defender assigned to the case, Mr. Orloff. He filed a *pro se* motion on October 1, 1985, in which he requested the court to "remove" his present counsel and appoint him "other counsel from outside of the Public Defender's office and from outside of Will County." Defendant claimed in the motion that his counsel denied him opportunities to review discovery

materials, refused to investigate certain matters, and failed to contact certain individuals whom he believed should be interviewed.

During the hearing on the motion, defendant stated that he was unable to communicate with his attorneys, and that they were attempting to "convict me more than the State is right now." He further claimed that his attorneys refused to interview certain individuals with whom the police spoke in connection with the murders. When the court inquired as to the basis for defendant's belief that these individuals gave statements to the police, he responded: "It comes around. You hear it, you check it out, you find out. That's all I can tell you about it." Defendant conceded that no one ever informed him that the individuals he wished to have interviewed spoke with the police.

In response to defendant's motion, the State represented to the court that, during his previous murder trial, defendant also moved to dismiss his counsel on the date of trial, claiming he was unable to communicate with the attorneys appointed to represent him. Defendant did not dispute this representation.

At the conclusion of the hearing, the court denied defendant's motion, finding that he failed to provide any basis upon which the court should appoint other counsel.

During another hearing conducted on the afternoon of October 1, 1985, defendant informed the court that he refused to accept Messrs. Andreano and Orloff as his attorneys; he refused to represent himself; and that he intended to absent himself from the proceedings. The court advised defendant that he had a right not to be present during trial, but that he would require his counsel to conduct the defense.

On October 2, 1985, the date scheduled for jury selection, defendant changed his mind and appeared in court. Since it was unclear at that time whether he intended to

proceed *pro se,* or to absent himself from the proceedings, the court gave defendant the following admonishments:

"THE COURT: Mr. Johnson, you had previously been represented in this cause by privately retained counsel, Mr. Swano, is that correct? ***

MR. JOHNSON: Original counsel in this case, yes.

THE COURT: Okay, and during the time that Mr. Swano represented you, he advised you of the charges against you, did he not?

MR. JOHNSON: Yes.

THE COURT: Four separate distinct felony murder charges, as well as four murder charges involving four different people, is that correct?

MR. JOHNSON: Yes.

THE COURT: Allegedly occurring at a ceramic shop on East Cass Street. He also informed you as to the possible sentence or sentences that could be imposed if you were found guilty of any or all of these charges, is that correct?

MR. JOHNSON: Yep.

THE COURT: You are aware that they are capital cases? In other words, if the State, upon conviction of any of these charges, could request, and did, in fact, indicate early in this cause that they were going to seek a death sentence hearing in the event of any conviction, is that correct?

MR. JOHNSON: True.

THE COURT: So that you're fully aware of that?

MR. JOHNSON: I am.

THE COURT: You're also fully aware that you are entitled to be represented by a lawyer, that your original lawyer retained by you or your family was allowed to withdraw when it developed that certain monetary arrangements could not be completed by you or your family, and that you insisted that he be allowed to withdraw because in your words you didn't think if he wasn't getting paid he would do the maximum effort in your behalf, is that a correct statement?

MR. JOHNSON: True.

THE COURT: Following the allowance of that withdrawal, the Court appointed [the] Public Defender and indicated Mr. Sam Andreano, Public Defender, would be one of the counsel representing you, and that you had no objection at that time to Mr. Andreano, is that a correct statement?

MR. JOHNSON: True.

THE COURT: And that that appointment was made, sir, on December 19th of 1984, that is the date that Mr. Swano [was] relieved and that is the same date that Mr. Andreano was appointed with certain restrictions on Mr. Andreano, at your request, that Mr. Alex Bonds and Mr. Ira Goldstein, Assistant Public Defenders, would not be assigned to the case in any way, is that correct?

MR. JOHNSON: True.

THE COURT: And that from that December 19th, 1984, up until September 30, 198[5], there had been no request by you *** to remove Mr. Andreano and Mr. Richard Orloff from representing you. The first motion or indication of any dissatisfaction was on September 30th, is that correct?

MR. JOHNSON: True."

The court then asked defendant whether he still wished to absent himself from the proceedings. Defendant responded that he did "not know" but that he would decide after talking further with Mr. Andreano. The court then recessed the proceedings to allow defendant an opportunity to consult with his counsel.

When court reconvened shortly thereafter, Mr. Orloff stated that he and Mr. Andreano spoke with defendant and that they would continue to represent him. However, when the court asked defendant if he was accepting them as his counsel for the duration of the trial, he stated that he was not. The court again inquired of defendant whether he intended to proceed *pro se*, and he responded that "[T]hese counsel and I are trying to get an understanding. That's the only thing I can say about these counsels right now."

At the conclusion of the hearing, defendant represented that he was willing to communicate with his counsel. Accordingly, the court continued the proceedings until the following day to allow him a further opportunity to consult with them.

When court reconvened on October 3, 1985, Mr. Andreano stated that defendant refused to speak with him and that nothing "has been resolved nor can it be." The court thereupon advised defendant that he would be required to proceed *pro se*, but that Messrs. Andreano and Orloff would be appointed as standby counsel "available for advice and consultation at all times during the course of this trial." The trial was continued until November 12, 1985, to provide defendant with an opportunity to review the discovery and prepare for trial.

On November 12, 1985, the court again asked defendant whether he would accept Messrs. Andreano and Orloff as his attorneys. At that time, defendant indicated that he would prefer to have them represent him than to proceed *pro se*. Defendant also advised the court that he believed his prior counsel, Mr. Swano, failed to tender to his current counsel all of the discovery materials pertaining to the case. The court thereupon continued the case to subpoena Mr. Swano and hold a hearing on defendant's claim.

Mr. Swano appeared in court on November 20, 1985, at which time an extensive hearing was conducted. The court determined that defendant's allegations were unwarranted, and rescheduled the trial for the following day. The defendant again advised the court that he was accepting Mr. Andreano, and a new assistant public defender, Kathleen Kallen, to represent him. At Mr. Andreano's request, the court continued the trial date to allow defendant further opportunities to consult with his lawyers, and to file any desired pretrial motions.

On November 26, 1985, during a hearing on various motions, defendant advised the court that he did not agree with a proposed stipulation his attorneys intended to enter into with the State regarding certain evidence. As a result, he again refused to be represented by his counsel and informed the court that he would not be present for the trial. The court thereupon reappointed Mr. Andreano and Ms. Kallen as standby counsel.

The case was continued until December 2, 1985. On that date, defendant inquired about the types of matters as to which he could consult with standby counsel. The court responded that they could advise him with respect to *voir dire* questions and the examination of witnesses, and they would aid in the preparation of any subpoenas defendant wished to issue. The court advised defendant that standby counsel could not conduct any witness examinations.

During another hearing held later that afternoon, the court again admonished defendant that the offenses charged could be the basis for imposition of the death penalty. The court also advised defendant that if he were convicted, he could receive a death sentence because of his prior murder conviction. Finally, the court explained to defendant the two phases of the death penalty hearing and stated that, in the event the jury did not impose the death sentence, "the Court will give the number of years" for which defendant would be incarcerated. The court failed to apprise defendant that, as a result of his prior murder conviction, life imprisonment was the minimum sentence that could be imposed if he were convicted of any of the offenses charged.

On December 3, 1985, the court conducted a hearing relative to the parties' proposed *voir dire* questions. Two of the questions prepared by standby counsel, and reviewed by defendant, related to the jurors' attitude toward life imprisonment as a penalty for the offense of

murder. In defendant's presence, the State objected to these proposed questions, stating: "If the Defendant is convicted, it's [life imprisonment] a mandatory sentence ***." Defendant agreed to omit these two questions.

The trial commenced after several days of jury selection. Defendant questioned the prospective jurors, delivered an opening statement, argued evidentiary issues, cross-examined the State's witnesses, and called several witnesses to testify on his behalf. Although defendant's standby counsel were present throughout the trial, the record does not disclose whether they actually assisted defendant during the course of the proceedings.

Defendant initially contends that he did not knowingly and intelligently waive his right to counsel during the guilt phase of the trial where he was not properly admonished in accordance with our Rule 401(a) (107 Ill. 2d R. 401(a)). In a related contention, he argues that his sixth amendment right to counsel was violated because the trial court incorrectly advised him as to the minimum sentence that would be imposed in the event he was convicted. The State responds that Rule 401(a) admonishments were unnecessary because defendant did not actually waive his right to counsel. In the alternative, it is argued that even if the admonishments were required, the trial court substantially complied with Rule 401(a).

Supreme Court Rule 401(a) provides, in relevant part:

"Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
    (1) the nature of the charge;
    (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which

the defendant may be subjected because of prior convictions or consecutive sentences; and

(3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." 107 Ill. 2d R. 401(a).

We note initially that defendant failed to raise this issue in his *pro se* post-trial motion. "The general rule is that the failure by a defendant to raise an issue in the written motion constitutes a waiver and the issue cannot be urged as a ground for reversal on review. This waiver rule applies to constitutional as well as to other issues." *People v. Precup* (1978), 73 Ill. 2d 7, 16, citing *People v. Pickett* (1973), 54 Ill. 2d 280.

Further, we find that, under the circumstances of this case, defendant was properly admonished in accordance with Rule 401(a).

Contrary to defendant's contention, the record reveals that he was informed of the "nature of the charges" against him. The trial court specifically advised defendant that he was charged with "four separate *** felony murder charges, as well as four murder charges involving four different people," and that the offenses occurred "at a ceramic shop on East Cass Street." Moreover, defendant was furnished with a copy of the indictment, and informed the trial court that he was "familiar with it." He further represented that his original counsel, Mr. Swano, also informed him as to the nature of the charges. Defendant never indicated to the trial court that he did not understand the charges, and he does not make that claim here.

We do agree with defendant that he was not specifically advised by the trial court that, because of a previous murder conviction, he faced a mandatory minimum sentence of life imprisonment upon conviction of any of the offenses here charged. He contends that, in the absence of a strict, technical compliance with Rule 401(a),

any waiver of counsel will automatically be invalid and the alleged error reversible. (*E.g.*, *People v. Derra* (1981), 92 Ill. App. 3d 1106; *People v. Montoya* (1981), 94 Ill. App. 3d 6; *People v. Brown* (1980), 80 Ill. App. 3d 616.) The State, in turn, directs our attention to several appellate court cases which hold that substantial compliance with Rule 401(a) is sufficient. *E.g.*, *People v. Black* (1979), 68 Ill. App. 3d 309; *People v. Pittman* (1979), 75 Ill. App. 3d 683; *People v. Jackson* (1978), 59 Ill. App. 3d 1004.

We believe that where, as here, a review of the entire record indicates that defendant's waiver of his right to counsel was made knowingly and voluntarily, and the sole admonishment which he did not receive in no sense prejudiced defendant's rights, substantial compliance with Rule 401(a) is sufficient to effectuate a valid waiver of counsel. Further, under the circumstances of this case, we find that the trial court's admonishments substantially complied with the Rule.

The trial court advised defendant of his right to be represented by counsel, informed him of the charges and where the offenses took place, explained to him the phases of the death penalty hearing and his right to a jury during those phases of the proceeding. Defendant was also fully and repeatedly admonished regarding the possibility that he might receive a death sentence, both because of his prior murder conviction and because of the nature of the offenses charged. Although the trial court did not advise defendant that life imprisonment was the minimum penalty to which he would be subjected in the event he was convicted of the charges, the record reveals that he was aware of this penalty.

As previously noted, defendant reviewed the *voir dire* questions drafted by his attorneys, two of which referred to life imprisonment as a punishment for the offenses charged. In defendant's presence, the State ob-

jected to these proposed questions on the ground that life imprisonment was a "mandatory sentence." Contrary to defendant's claim, we do not believe that the fact he subsequently agreed to omit these questions indicates that he did not realize he could receive a sentence of life imprisonment.

We note in this connection that defendant does not claim he was unaware of the potential penalties in the event he was convicted of the charges. Indeed, he was initially represented by privately retained counsel, and defendant represented to the court that his attorney informed him of the possible penalties that could be imposed if he were found guilty on any or all of the charges.

Moreover, the record reveals that defendant is no stranger to criminal proceedings. He had previously been tried and convicted for aggravated battery, burglary and rape, and was incarcerated for those offenses from 1970 until March of 1983. Subsequently, he was convicted of murder, attempted murder, rape, aggravated kidnapping, and deviate sexual assault arising out of an incident occurring on July 17, 1983. This court upheld his death sentence in that case in 1986. (*People v. Johnson* (1986), 114 Ill. 2d 170.) Defendant was represented by counsel throughout the proceedings which culminated in his death sentence, and, as demonstrated by the foregoing, had ample opportunity to become acquainted with his right to counsel. *Cf. People v. Hall* (1986), 114 Ill. 2d 376, 412-13 (it is "reasonable to conclude" that defendant was aware of the requirement that the jury reach a unanimous decision on the death sentence since he "had the experience" of four prior felony convictions); *People v. Albanese* (1984), 104 Ill. 2d 504, 536 (since defendant had already been sentenced to death by a jury in a related case, he was "familiar with the jury's function at the sentencing hearing").

Finally, it is clear that defendant suffered no preju- dice as a result of the trial court's failure to specify the minimum penalty to which he would be subjected in the event of his conviction. Defendant was fully apprised that he could receive the death penalty, and that was, in fact, the punishment imposed. We note in this connection that he does not assert his decision to waive counsel would have been different had he been specifically admonished regarding the possibility of a sentence to life imprisonment and our review of the record, including his alleged reasons for choosing to represent himself, indicates that he could make no such claim. *Cf. People v. Hall* (1986), 114 Ill. 2d 376, 412 ("It is apparent that the requirement that a jury reach a unanimous decision on the death sentence played no part in [defendant's] jury waiver, and we will not find error in the court's failure to admonish [him] of the requirement").

It is our view, based on the record, that the trial court did what it could to accommodate defendant during the entire course of the proceedings. Defendant, on the other hand, engaged in conduct designed to impede and delay those proceedings. As previously noted, at defendant's request, the trial court allowed his privately retained counsel to withdraw from the case, and appointed Mr. Andreano of the public defender's office to represent him. At the time of the appointment, defendant stated that he would be "more than satisfied" if Mr. Andreano served as his counsel. Then, several months later, on the eve of trial, defendant advised the court that he wished to have new counsel appointed from "outside" Will County and not affiliated with the public defender's office. When the request was denied because defendant failed to provide any basis for the appointment of new counsel, defendant stated that he would not "accept" his current counsel, he would not represent

himself, and he intended to absent himself from the proceedings.

The next day, having apparently changed his mind, defendant appeared in court. However, he refused to represent to the trial court whether or not he intended to proceed *pro se*. On several occasions, defendant attempted to delay and manipulate the proceedings by refusing the services of his counsel and refusing to represent himself.

We recognize, of course, the importance of a defendant's right to counsel. However, we cannot countenance use of that right in a manner which appears calculated to "thwart the administration of justice or to otherwise embarrass the effective prosecution of crime." (*People v. Myles* (1981), 86 Ill. 2d 260, 268.) As this court recently stated in *People v. Taylor* (1984), 101 Ill. 2d 508, 523, wherein defendant claimed he was denied the effective assistance of counsel:

> "Defendant repeatedly interfered with counsel's efforts to represent him competently, and attempted to delay the proceedings on several occasions by asserting his inability to obtain counsel and his desire to waive counsel and appear *pro se*. *** Our system of criminal justice simply could not function were we to permit defendants, indigent or otherwise, to intentionally hamper counsel's efforts to represent them and later plead the resulting ineffectiveness of counsel as a grounds for reversal."

See also *People v. Hall* (1986), 114 Ill. 2d 376, 403-04; *People v. Friedman* (1980), 79 Ill. 2d 341, 349.

Similarly, a defendant should not be permitted to frustrate the trial court's efforts to conduct an orderly, fair and expedient trial, and then benefit from an alleged error by the court which he invited through his own conduct.

In addition to the foregoing, we believe the admonishments defendant received in this case were sufficient

since, although he represented himself, he had the benefit of standby counsel "for advice and consultation at all times during the course of [the] trial." Whether or not defendant actually chose to avail himself of their services, and the extent to which counsel in fact participated in the proceedings is not, as defendant suggests, the relevant inquiry.

In *People v. Myles* (1981), 86 Ill. 2d 260, the defendant similarly had his privately retained counsel removed from the case, refused to proceed *pro se*, and stated that he did not desire the services of the public defender whom the court had appointed. The trial court refused to allow the assistant public defenders to withdraw, and they were available to advise defendant throughout the trial. Although they apparently tendered advice to defendant, they did not participate in the trial. In determining that Rule 401(a) was inapplicable under these circumstances, this court held:

> "Here defendant clearly and repeatedly declined to undertake his own representation. *** Defendant's refusal to heed the advice or employ the services of appointed counsel did not necessitate that the circuit court admonish defendant in accordance with Rule 401(a)." 86 Ill. 2d at 269.

Defendant invites us to reconsider our holding in *Myles* in light of the United States Supreme Court's subsequent decision in *McKaskle v. Wiggins* (1984), 465 U.S. 168, 79 L. Ed. 2d 122, 104 S. Ct. 944. We decline to do so as *McKaskle* is not apposite to the issue before us.

In *McKaskle*, the Court held that defendant's sixth amendment right to self-representation was not violated by the trial court's appointment of standby counsel over defendant's objection. In so holding, the Court stated that a defendant who wishes to proceed *pro se* must "preserve actual control over the case," and "participa-

tion by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that defendant is representing himself." In proceedings outside the jury's presence, defendant must be able to "address the court freely on his own behalf" and any disputes between him and his counsel should be resolved in his favor. 465 U.S. at 178-79, 79 L. Ed. 2d at 133-34, 104 S. Ct. at 951.

Defendant is apparently arguing that, based upon *McKaskle*, he in fact proceeded *pro se* despite the appointment of standby counsel, and thus compliance with Rule 401(a) was necessary. However, *McKaskle* did not address the issues of when a defendant will be deemed to waive counsel and what specific admonishments are necessary in the event he does. That case was concerned only with the extent to which standby counsel may participate in the proceedings consistent with defendant's right to represent himself.

In a related contention, defendant asserts that his alleged waiver of counsel violated the sixth amendment because he was misled by the trial court's statement that he could be incarcerated for a "number of years" when, in fact, the minimum penalty was life imprisonment. As previously noted, this comment was made in the context of the trial court's explanation to defendant as to the role of a jury in the death sentencing hearing. The court informed defendant that it was the jury's province to recommend the death penalty and, if it chose not to do so, it was the court's responsibility to determine the length of defendant's prison sentence. This remark was an accurate explanation of the roles of the judge and jury during the sentencing phase of the proceeding. Thus, defendant's argument is reduced again to the contention that he was not advised that life imprisonment was the minimum applicable penalty in the event he was convicted. For the same reasons that the failure to so

admonish defendant did not violate Rule 401(a), under the facts of this case, we do not believe defendant's sixth amendment rights were violated.

Defendant cites several Federal court cases for the proposition that his alleged waiver of counsel was not "knowing" or "voluntary" because he was not accurately advised of the range of possible punishments. (*Von Moltke v. Gillies* (1948), 332 U.S. 708, 92 L. Ed. 309, 68 S. Ct. 316; *Molignaro v. Smith* (5th Cir. 1969), 408 F.2d 795; *Meadows v. Maxwell* (6th Cir. 1967), 371 F.2d 664; *Gannon v. United States* (6th Cir. 1953), 208 F.2d 772.) In each of these cases, contrary to the instant case, the defendants both waived their right to counsel *and*, without benefit of counsel, pled guilty to the charges against them. Moreover, the admonishments the defendants received in those cases fall far short of those which defendant here received.

We do not mean to imply by our holding that trial courts may disregard the admonishments set forth in Rule 401(a). It would have been preferable, in the instant case, if the court recited to defendant each of those admonishments. We hold only that, considering all of the circumstances of this case, defendant was sufficiently admonished in accordance with Rule 401(a). *Cf. People v. Stewart* (1984), 101 Ill. 2d 470, 485-87 (the trial court substantially complied with Rule 402, relating to guilty pleas, although it did not specifically advise defendant of the nature of the charge against him or the minimum penalty applicable in the event he was convicted).

Defendant further contends that his convictions should be reversed because the prosecutor made two comments during closing argument in the guilt phase of the trial which allegedly denied him his right to a fair trial. Neither of the comments as to which defendant assigns error was objected to at trial. Thus, as the State points out, defendant would ordinarily be precluded from

raising these issues on appeal. *People v. Hall* (1986), 114 Ill. 2d 376, 418; *People v. Lewis* (1981), 88 Ill. 2d 129, 149 (objections to prosecutor's argument not raised are waived).

However, defendant did raise, in his *pro se* post-trial motion, that "prejudicial, inflammatory" remarks were made by the prosecutor during his closing argument. Moreover, during the April 10, 1986, hearing on defendant's motion, he specifically referred to the two remarks which he now asserts were improper. Accordingly, we have considered the comments which defendant contends constitute prejudicial error.

Defendant initially argues that the prosecutor's characterization of him as an "animal" was an improper attempt to inflame and prejudice the jury. Specifically, the prosecutor made the following remark during closing argument:

> "Mr. White: What you have heard in this case was how five people became involved in Greenware by Merry [*sic*], the ceramic shop on East Cass Street on August 20, 1983.
>
> Four of those people were butchered by an animal, and that animal is among us today, and he sits right there. (Indicating.)"

This court has consistently "emphasized that prosecutors may not engage in inflammatory" arguments designed solely to arouse the passions of the jury. (*People v. Bryant* (1983), 94 Ill. 2d 514, 523, citing *People v. Whitlow* (1982), 89 Ill. 2d 322.) Indeed, this court has specifically held that it is improper to characterize a defendant as an "animal," even where that characterization is based on the evidence. (*People v. Mackey* (1964), 30 Ill. 2d 190; *People v. Elder* (1962), 25 Ill. 2d 612. Accord, *Darden v. Wainwright* (1986), 477 U.S. 168, 91 L. Ed. 2d 144, 106 S. Ct. 2464.) Nevertheless, "[i]mproper remarks generally do not constitute reversible error un-

less they result in substantial prejudice to the accused." *People v. Tiller* (1982), 94 Ill. 2d 303, 321, quoting *People v. Baptist* (1979), 76 Ill. 2d 19, 29. See also *People v. Johnson* (1986), 114 Ill. 2d 170, 199 (improper prosecutorial comments which are not a material factor in defendant's conviction do not constitute reversible error).

Here, the jury was specifically instructed that closing arguments are not evidence, and to disregard any statements made during arguments which were not based on evidence. Prior to commencing his closing argument, the prosecutor also informed the jury that "what I say here in argument is not evidence." We note additionally that the comment, to which defendant did not object, was an isolated remark and was not dwelled upon further by the prosecutor.

Moreover, the evidence presented at trial was not "closely balanced." (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.) Indeed, defendant does not even contend that the evidence was insufficient to establish his guilt beyond a reasonable doubt.

The record reveals that three of the victims, Pamela Ryan, Anna Ryan, and Barbara Dunbar, drove to the ceramic shop on the morning of the murders in a 1977 Chevrolet Blazer belonging to Pamela Ryan and her husband. The Blazer was discovered later that afternoon at a nearby car wash. The testimony from various police officers and investigators established that two of defendant's fingerprints were found on the vehicle, one of which was recovered from an apparent bloodstain on the gear shift.

Photographs were taken of footprint impressions discovered at the scene of the murders and in the area where the Blazer was parked at the car wash. The footprints were made by a gym shoe with a diamond-shaped pattern, and could have been made by a size 10 or 11

shoe. The diamond pattern was identical to the one depicted on the soles of a pair of size 10 or 11 Converse All-Star gym shoes recovered from the home of Dolly and Sam Myers, with whom defendant was residing. Defendant wore size 11 shoes.

In addition, three .357-magnum-caliber shells with a Lubaloy coating were recovered from the home in which defendant resided. Bullet fragments discovered at the scene of the murders also had a Lubaloy coating, which one witness testified was an "unusual" ammunition coating. While the fragments were unsuitable for further comparison, they could have been fragments from a .357-caliber bullet.

Three of the victims' purses, which contained virtually no money, were discovered in a creek located about three-tenths of a mile from Jim's Pool Hall in Joliet. Testimony revealed that defendant was gambling at that pool hall on the afternoon of the murders, at which time he had approximately $500 in cash. Other evidence revealed that the victims had $500 to $600 in cash in their purses on the morning of the murders.

Finally, defendant is a black man and two Negroid hair fragments were recovered from a blood-stained cloth found near one of the victim's bodies. Although one witness, apparently a black woman, testified that she visited the ceramic shop a few days before the murders, she stated that she did not use that cloth.

We are cognizant that some conflicting testimony was presented at trial, and that the evidence against defendant was circumstantial. We also recognize that he produced two witnesses who claimed to have seen an individual other than defendant operating the Ryans' vehicle on the afternoon of the murders. Nevertheless, after a careful review of the record, we are convinced that the improper comment did not constitute a material factor in defendant's convictions or deprive defendant from re-

ceiving a fair trial. We therefore conclude that the remark did not constitute reversible error.

Defendant further claims that, during his closing argument, the prosecutor improperly asserted his personal opinion, and argued facts which were not based on evidence, in an alleged effort to discredit a principal defense witness. In order to address defendant's contention, it is necessary to briefly review the relevant testimony adduced at trial.

Sandra Killman testified for the defense that during the afternoon of August 20, 1983, while driving in the vicinity of East Cass Street, she observed a red and white Blazer with license plate number RR650, which other evidence indicated was the license number of the Ryans' vehicle. She stated that the vehicle was operated by a Caucasian male with "sandy-blond hair, about shoulder-length, and in his early twenties."

On cross-examination, Killman stated that she underwent hypnosis several weeks subsequent to the murders. Prior to being hypnotized, she was unable to describe the driver of the Blazer.

During the State's rebuttal, David Simpson, a sergeant with the Will County sheriff's office, testified that he interviewed Killman in connection with her observation of the Blazer. Killman personally pointed out to him the locations where she observed the vehicle. According to the measurements Simpson obtained, Killman was approximately 580 feet from the Blazer at the time she first observed it. She was 850 feet from the vehicle when she first observed the license plate. Simpson also testified that the letters on a license plate are approximately three inches in height.

With reference to Killman's observation of the Blazer, the prosecutor made the following remark during closing argument:

"Mr. White: She first saw the Blazer at 580 feet, as it was measured, and then saw a license plate from a distance of 850 feet.

Now, the letters or numbers on a license plate are two inches, three inches high. From 850 feet, if you take the standard print, approximately one eighth of an inch in a magazine print. Since there are 24 one eighths to three inches, one is to 24 as what is to 850 feet, and if you work that proportion out, it would be similar to reading a magazine from a distance of 35.4 feet, and you can hold a magazine at 35.4 feet, and it is literally impossible to read, absolutely impossible to read that magazine.

You can't read it from 600 feet. A license plate, which would be the same as 25 feet, if you take it even to 300 feet, that's reading a magazine from 12-and-a-half feet, and that, too, is impossible."

We agree with defendant that it is improper for a prosecutor to express his personal opinion or to argue facts which are not based on any evidence. (*People v. Weaver* (1982), 92 Ill. 2d 545; *People v. Beier* (1963), 29 Ill. 2d 511.) However, it is perfectly permissible for the prosecutor to state an opinion which is based on the record, or on a legitimate inference derived therefrom. *E.g., People v. Johnson* (1986), 114 Ill. 2d 170; *People v. Owens* (1984), 102 Ill. 2d 88; *People v. Bryant* (1983), 94 Ill. 2d 514.

Contrary to defendant's contention, the prosecutor's opinion that the license plate would have been "impossible" to read was based on testimony relating to the distance from which Killman claimed to have observed the plate, and the height of the letters appearing on the license plate. The prosecutor's comparison between reading a license plate and a magazine, even if the jury could comprehend it, did not, as defendant suggests, "so [infect] the trial with unfairness as to make the resulting conviction[s] a denial of due process." *Darden v. Wain-*

*wright* (1986), 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157, 106 S. Ct. 2464, 2472.

Having determined that no reversible error occurred during the guilt phase of defendant's trial, we next consider allegations of error at the sentencing proceeding.

Defendant initially contends that he did not knowingly and intentionally waive his right to counsel during the sentencing hearing and the hearing on his post-trial motion. We note that defendant failed to raise this issue in the trial court. (See *People v. Precup* (1978), 73 Ill. 2d 7, 16.) Further, we believe that defendant's sixth amendment rights were not violated by the trial court's failure to repeat at the subsequent proceedings the same admonishments it gave him prior to trial.

At the commencement of the sentencing proceeding, defendant informed the court that he waived his right to a jury, "and any defense in this sentencing phase, and I will be absenting myself from the sentencing phase of the trial." The trial court then advised defendant that he could return to the courtroom when he desired, and that he was entitled to cross-examine any of the witnesses and to consult with standby counsel, who would be present for the proceedings. Defendant was subsequently placed in a room where he could listen to the proceedings through an audio system. The record does not reveal whether counsel actually assisted defendant; however, he did cross-examine a witness at length and objected to the admission of certain evidence.

Since we have previously held that the admonishments defendant received prior to trial were sufficient, the precise issue here is whether his alleged waiver of counsel at that time was operative during all subsequent proceedings. Under the circumstances of this case, and based upon this court's decision in *People v. Baker* (1982), 92 Ill. 2d 85, we hold that it was.

In *Baker*, the defendant appeared for his arraignment on a murder charge with court-appointed counsel, and informed the trial court that he did not wish to be represented by an attorney. The court advised him, as it did on other occasions, that he had a right to counsel at all stages of the proceedings. Defendant persisted in his refusal to be represented by counsel, and entered a plea of guilty to the charge. Approximately two weeks later, defendant appeared at his sentencing hearing without counsel, and received a term of 30 years to life imprisonment.

The appellate court concluded that defendant was entitled to a new sentencing hearing because the court failed to again advise him at the sentencing hearing of his right to counsel. This court reversed, concluding that the trial judge was not "required to renew the offer of counsel or ascertain whether defendant had changed his mind when he appeared for sentencing two weeks later." (92 Ill. 2d at 91.) In so holding, this court noted:

> "The greater number of courts considering the precise issue here presented have held that a competent waiver of counsel by a defendant once made before the court *carries forward to all subsequent proceedings* unless defendant later requests counsel or there are circumstances which suggest that the waiver was limited to a particular stage of the proceedings." (Emphasis added.) 92 Ill. 2d at 91-92.

Here, of course, defendant did not change his mind and later request counsel and, contrary to his claim, there is nothing in the record which suggests that he only intended to represent himself during the guilt phase of the trial. Moreover, we do not agree with defendant's claim that *Baker* is distinguishable because there, unlike in the instant case, the trial court specifically stated that he was entitled to an attorney "at all stages of the proceeding."

The trial court specifically advised defendant that he had a right to be represented by an attorney, and did so in the context of apprising him that he was charged with capital offenses for which the State could seek the death penalty. In addition, as previously noted, defendant had already been convicted of murder and sentenced to death in another case, and was represented by counsel throughout those proceedings. Thus, he became familiar with his right to counsel during post-trial proceedings. Further, the fact that defendant had standby counsel present during those proceedings belies any claim that he was unaware of his right to counsel.

Defendant further asserts that the "continuing waiver" doctrine adopted in *Baker* and the several cases cited therein should be rejected as contrary to the holding in *Chessman v. Teets* (1957), 354 U.S. 156, 1 L. Ed. 2d 1253, 77 S. Ct. 1127. We disagree, as that case is factually inapposite.

In *Chessman*, the defendant chose to represent himself during the trial proceedings, although the court advised him of his right to counsel. Subsequent to the proceedings, the official court reporter for the case died, and the testimony was transcribed by other reporters. A hearing was conducted on settlement of the transcript, which constituted the record upon which the State supreme court would decide defendant's appeal. Counsel for the State was present; however, despite his request, defendant was not permitted to participate in the hearing. An attorney was not appointed to attend the hearing on his behalf. The United States Supreme Court held that where defendant's request to appear *pro se* in the settlement proceeding was denied, it was incumbent on the court to appoint him counsel for the proceeding despite defendant's waiver of counsel at trial. The failure to do so rendered the *ex parte* hearing a denial of due process.

Similarly, the remaining cases upon which defendant primarily relies for the proposition that the "continuing waiver" rule is invalid are distinguishable from the instant case. In *Rini v. Katzenbach* (7th Cir. 1968), 403 F.2d 697, the trial court failed to advise defendant of his right to counsel at *any* stage of the proceedings, including the sentencing hearing where defendant attempted to withdraw a previously entered guilty plea. In both *Davis v. Holman* (5th Cir. 1965), 354 F.2d 773, and *Tobin v. United States* (7th Cir. 1968), 402 F.2d 307, defendants, without benefit of counsel, changed their pleas from not guilty to guilty. Finally, in *Williams v. Alabama* (5th Cir. 1965), 341 F.2d 777, the court merely held that an effective waiver of counsel at trial could not operate retroactively to cure the trial court's failure to offer the defendant counsel at his arraignment. The court further noted that defendant was prejudiced by not having counsel at the arraignment to plead a potentially meritorious insanity defense.

Here, of course, we are not confronted with the situation wherein a defendant who previously waived counsel later chooses to enter a guilty plea without benefit of an attorney's advice. Since the facts in this case do not reveal any change in circumstances which might trigger the necessity to admonish defendant anew, his alleged waiver of counsel prior to trial was operative throughout the subsequent proceedings.

Defendant next asserts that because there is some "residual doubt" of his guilt, imposition of a death sentence is "inappropriate and excessive." Again, defendant failed to raise this issue in the trial court. In any event, even assuming that "residual" or "whimsical" doubt were a factor warranting a lesser penalty, there is simply no evidence in the record that the trial court harbored any such doubt with respect to defendant.

The court presided over defendant's trial and was the sentencing authority during the death penalty hearing. Based on the evidence before him, and after considering all aggravating and mitigating circumstances, the court determined that the death penalty was appropriate. Given defendant's prior serious criminal history, and the multiple offenses involved in this case, we do not agree that imposition of the death penalty upon defendant was excessive.

Defendant further contends that he was denied the opportunity to confront witnesses against him during the second phase of the sentencing hearing when the trial court allowed into evidence the hearsay testimony of John Meduga, an investigator with the Illinois Department of State Police, and Lee Chandler, a witness to one of defendant's previous offenses.

Chandler testified, *inter alia*, that he and his companion Penny Williams were accosted in her automobile on the evening of February 15, 1970, by an individual "later identified" as the defendant. He stated that defendant took his wallet, struck Williams repeatedly, burned her with a cigarette lighter, and sexually assaulted her.

Officer Meduga testified that he interviewed Gayle Payne in connection with a July 1983 incident in which she was kidnapped, raped and stabbed and her companion, Anthony Hackett, was shot to death. Meduga stated that Payne identified defendant as the perpetrator of the offenses. He also stated that bullets recovered from the scene of the offense and from Hackett's body were identified by an employee of the State crime lab as .357-magnum Lubaloy bullets.

We note initially that defendant failed to object to this testimony, and did not raise the admission of this evidence as error in his post-trial motion. Thus, the alleged errors would normally be deemed waived. See *People v.*

*Szabo* (1986), 113 Ill. 2d 83, 93; *People v. Precup* (1978), 73 Ill. 2d 7, 16.

Further, "it is well settled that a defendant in a capital case has no due process right to cross-examine all out-of-court sources of information relied upon in sentencing." (*People v. Jones* (1982), 94 Ill. 2d 275, 286, citing *Williams v. New York* (1949), 337 U.S. 241, 250-51, 93 L. Ed. 1337, 1343-44, 69 S. Ct. 1079, 1085. But see *Proffitt v. Wainwright* (11th Cir. 1982), 685 F.2d 1227, 1253-54 (defendant was entitled to cross-examine a physician-witness before his report could be used in determining sentence).) Thus, hearsay testimony is not "*per se*" inadmissible during the second phase of a sentencing proceeding (*People v. Hall* (1986), 114 Ill. 2d 376, 417; *People v. Morgan* (1986), 112 Ill. 2d 111, 143), even where there has been no showing that the declarant is unavailable to testify. See *People v. Szabo* (1986), 113 Ill. 2d 83, 94-95; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 437-38.

The "factors controlling the admissibility of evidence at a capital sentencing hearing are relevance and reliability." (*People v. Hall* (1986), 114 Ill. 2d 376, 416; *People v. Eddmonds* (1984), 101 Ill. 2d 44, 65.) Defendant does not, nor could he, contend that the evidence was irrelevant or unreliable. The testimony by both witnesses related to prior violent criminal offenses for which defendant was convicted.

Finally, we note that even if the evidence was erroneously introduced, the sentencing hearing was conducted by a trial judge acting without a jury, and he "is presumed to consider only competent and relevant evidence in determining sentence." *People v. Johnson* (1986), 114 Ill. 2d 170, 205, quoting *People v. Morgan* (1986), 112 Ill. 2d 111, 144.

Defendant next asserts that the trial court's alleged belief that it could not consider sympathy or prejudice in

imposing sentence violated the eighth and fourteenth amendments of the United States Constitution. Defendant apparently refers to Instruction 1.01(5) of the Illinois Pattern Jury Instructions, Criminal, No. 1.01(5) (2d ed. 1981), which requires the trier of fact to base its verdict on the evidence and not on any sympathies or prejudices which may exist.

Once again, defendant did not raise this issue in the trial court. Moreover, this court has previously rejected his claim (*People v. Morgan* (1986), 112 Ill. 2d 111, 145-46), and the United States Supreme Court has now upheld as constitutional an instruction to the jury in a capital sentencing hearing not to consider, *inter alia*, "sympathy" or "prejudice." *California v. Brown* (1987), 479 U.S. 538, ___, 93 L. Ed. 2d 934, 938, 107 S. Ct. 837, 838.

Nevertheless, defendant urges that we reconsider our prior holding in light of *Caldwell v. Mississippi* (1985), 472 U.S. 320, 330, 86 L. Ed. 2d 231, 240, 105 S. Ct. 2633, 2640, wherein the Supreme Court noted that "compassionate factors" are permissible considerations in capital cases. This court, too, "has acknowledged that mercy is a relevant factor for consideration at a capital sentencing hearing, but it is to be considered within the context of all factors in aggravation and mitigation." (*People v. Hall* (1986), 114 Ill. 2d 376, 416, citing *People v. Holman* (1984), 103 Ill. 2d 133, 170.) In the instant case, the record reveals that the trial court did consider mercy for the defendant, but determined that there were no factors which warranted it, or which justified imposition of a sentence other than the death penalty.

Finally, defendant raises numerous contentions concerning the constitutionality of the death penalty statute which were not raised in his post-trial motion and which have already been resolved. This court has determined that the statutory grant of discretion and authority to

the prosecutor is proper (*People v. Davis* (1983), 95 Ill. 2d 1; *People v. Brownell* (1980), 79 Ill. 2d 508); that the statute provides for adequate review to insure that sentences are not arbitrarily imposed (*People v. Kubat* (1983), 94 Ill. 2d 437); that the sentencing authority need not make written factual findings (*People v. Del Vecchio* (1985), 105 Ill. 2d 414); that defendants need not receive pretrial notice of all the aggravating factors upon which the State intends to rely (*People v. Albanese* (1984), 104 Ill. 2d 504); that the State is not required to prove the absence of mitigating factors beyond a reasonable doubt (*People v. Perez* (1985), 108 Ill. 2d 70); that the sentencing authority is not required to make a specific finding that death is the appropriate sentence (*People v. Del Vecchio* (1985), 105 Ill. 2d 414; *People v. Walker* (1985) 109 Ill. 2d 484); and that the statutory provision limiting application of the death sentence to defendants who do not require assistance to be fit for trial is not arbitrary (*People v. Whitehead* (1987), 116 Ill. 2d 425).

Defendant has provided no basis upon which this court should reconsider those holdings, but has instead referred us to the opinion of a Supreme Court justice who dissented from the denial of *certiorari* in two cases. We thus decline the invitation to overrule our previous decisions.

For the reasons stated herein, the judgment of the circuit court of Will County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, March 22, 1988, as the date on which the sentence entered in the circuit court of Will County is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville

Correctional Center, and to the warden of the institution wherein defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, concurring in part and dissenting in part:

I concur in the portion of the majority opinion affirming the defendant's convictions. I dissent, however, from the imposition of the death sentence for the reasons stated in my separate opinion in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), based on my belief that the Illinois death penalty statute is unconstitutional and that the death sentence in this case should be vacated. See also *United States ex rel. Lewis v. Lane* (C.D. Ill. 1987), 656 F. Supp. 181, 195 (expressing "grave doubts" over the constitutionality of the Illinois death penalty statute); *Eddmonds v. Illinois* (1984), 469 U.S. 894, 896, 83 L. Ed. 2d, 207, 208, 105 S. Ct. 271, 272 (Marshall, J., dissenting) (urging review of the Illinois death penalty statute because "there are serious questions about the constitutionality of a scheme that gives the prosecutor the unbridled discretion to select, from the group of individuals convicted of an offense punishable by death, the subgroup that will be considered for death"); *DeGarmo v. Texas* (1985), 474 U.S. 973, 975, 88 L. Ed. 2d 322, 323, 106 S. Ct. 337, 338 (Brennan, J., dissenting) (quoting *Gregg v. Georgia* (1976), 428 U.S. 153, 189, 49 L. Ed. 2d 859, 883, 96 S. Ct. 2909, 2932) ("[t]he selection process for the imposition of the death penalty does not begin at trial; it begins in the prosecutor's office. His decision whether or not to seek capital punishment is no less important than the jury's. Just like the jury, then, where death is the consequence, the prosecutor's 'discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action' "); see Schnapper,

*The Capital Punishment Conundrum*, 84 Mich. L. Rev. 715, 719 (1986) (quoting White, Book Review, *Life in the Balance: Procedural Safeguards in Capital Cases* (1984)) ("Any system that permits prosecutors to refrain from seeking the death penalty *** 'will exhibit all of the vices that *Furman* found antithetical to the values of the Eighth Amendment' "); Bowers, *The Pervasiveness of Arbitrariness and Discrimination Under Post-Furman Capital Statutes*, 74 J. Crim. L. & Criminology 1067 (1983) (arguing that prosecutors seek the death penalty for extralegal considerations); Note, *State v. Wilson: The Improper Use of Prosecutorial Discretion in Capital Punishment Cases*, 63 N.C.L. Rev. 1136, 1144 (1985) (concluding that "unbridled prosecutorial discretion permits arbitrary and capricious imposition of the death penalty").

I also disagree with the majority's apparent conclusion that because the sentencing hearing was conducted before a judge and not a jury (119 Ill. 2d at 149) the erroneous admission of evidence would be harmless error. Although there is a presumption that a judge considers only competent and relevant evidence in determining a sentence, it is a presumption only. My view is that if the evidence erroneously admitted is so prejudicial or voluminous as to draw into question any person's ability—judge or jury—to completely discount the evidence, the presumption may be set aside. It defies common sense and human nature to simply presume that a judge would not be be affected by the introduction of such evidence.

For these reasons, I respectfully dissent.