THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RAYMOND NICHOLS, Defendant-Appellant.

First District (2nd Division)   No. 1—91—0992

Opinion filed September 22, 1992.

Dennis A. Giovannini and Herbert L. Goldberg, both of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Brian Clauss, and George J. Arnold, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE HARTMAN delivered the opinion of the court:

Defendant appeals his conviction by a jury of murder (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), 9—1(a)(2)), and attempted murder (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4, 9—1). He questions whether (1) the court erred in admitting evidence and extensive State comment regarding his gang affiliation and involvement, and the prevalence of gangs in the area of the occurrence; (2) he was denied his right to due process and a fair trial when the State elicited testimony and commented during closing arguments regarding the connection between gangs and drug trafficking in the area of the offense; (3) the court improperly denied his motion *in limine* to exclude evidence of the location of his arrest; and (4) the court erred in allowing the State to inquire about his failure to call a supposedly exonerating witness.

Defendant was charged by indictment with two counts of first degree murder, three counts of aggravated battery and one count of attempted first degree murder. The case was tried on the murder and attempted murder counts. Defendant's motions *in limine* to exclude evidence of the nature of his prior conviction for possession of a controlled substance with intent to deliver, and to bar reference to the fact that he was exiting a courtroom when police arrested him, were denied.

At trial, Chicago police officer Barbara Pillows testified that about 9:25 p.m., January 3, 1990, she responded to a call of a man shot at 7204 South Green Street, where she found the decedent, Farrell Lamont Lee, lying near the curb, who appeared to be dead. Pil-

lows learned there was another man inside the house, Robert Prince, who also had been shot. Decedent was pronounced dead on arrival at the hospital.

Robert Prince testified that about 9 p.m. on the evening of the occurrence he left his home with his cousin Socrates Houston and the decedent and drove to Houston's home at 7204 South Green. The three men exited the car and were conversing outside Houston's home, when they saw defendant and another youth walking towards them on Green Street. Defendant shouted "BD," meaning "Black Disciples," and then pulled a gun out of his pants and began firing in the direction of Prince, Houston and decedent. Prince heard additional gunfire as he fled into the Houston house; he subsequently felt weak and realized he had been shot. The decedent was lying dead on the sidewalk. Prince was later treated for gunshot wounds to the liver and colon. On March 7, 1990, Prince positively identified defendant in a lineup. Prince never "hung out" in the area of 72nd and Green, and testified the decedent had never been there prior to the occurrence.

Prince testified that neither he nor decedent had ever known defendant before the date of the shooting, nor had they known Quintius Taylor, the youth who had accompanied defendant that night. Prince denied that he or the decedent were street-gang members. He knew the meaning of "BD" because he was surrounded by it on the south side. Although he was unable to remember exactly what defendant or his companion was wearing the night of the shooting, he would never forget their faces.

The parties stipulated that if called, Dr. Mary Jumbelic, a forensic pathologist, would testify that decedent died as a result of a gunshot wound to the neck and the manner of death was homicide.

Kevin Green testified that he lived in the area of 72nd and Green from the time he was 5 years old until age 19, and moved back to 7210 South Green in August of last year. Green, who was a funeral director, described the area in January 1990 as having gang activity, being "drug ridden" and "like a war zone." Over defense objections, Green described characteristics of the neighborhood gangs around the time of the offense: there were "BD," or Black Disciples, and "GD," or Gangster Disciples; both gangs were "folks," and their colors were black and blue; and both gangs were aligned under the six-point star symbol. The term "BD" was "common knowledge" in the neighborhood because it was heard very frequently. Green had conducted Black Disciples' funerals, where it was common to see the gang colors as well as wreaths in the shape of a six-point star.

On the night of the occurrence, Green was entering his home when he heard gunshots coming from the direction of the home of his neighbor, Socrates Houston. Green subsequently saw a man who "looked like he was dead" lying on the ground in front of Houston's house. Green did not know anyone named Robert Prince or Quintius Taylor, nor did he know defendant. On cross-examination, Green stated that the "vast majority" of young men in his area belonged to street gangs. He did not know whether Houston was a gang member.

Socrates Houston substantially corroborated Prince's testimony as to the events leading up to the shooting. He heard a male voice holler "BD," but did not turn around because he "hear[s] it every day around there." He denied being a member of a street gang.

Cassandra Brown testified that in December 1989, she resided in an apartment at 7108 South Green with Kim Smith and Kim's baby. Defendant "got" the apartment for Kim and Cassandra, and initially paid rent. Defendant was a member of the BD street gang. In early January 1990 defendant came to the apartment and unloaded and then reloaded a gun he kept in the apartment closet. When Brown heard sirens and saw an ambulance on Green Street, defendant said "he just killed some pussy motherfuckers down the street." Defendant later stated the police would have to kill him before they took him back to jail, and instructed Brown to wear royal blue silk to his funeral. Brown moved out of the apartment in February 1990. She was beaten up by five men, four of whom she recognized as friends of defendant, on February 26, 1990.

Quintius Taylor testified that he has known defendant about two years. Taylor denied ever being in a gang, or that he knew the meaning of "BD" or Black Disciples. Taylor resided for the past year at 7005 South Carpenter, "not too far" from the shooting, and previously resided about one block from the shooting for approximately three years. Taylor denied seeing defendant on the day of the occurrence, or that he knew the decedent or Prince.

Taylor admitted testifying before the grand jury that he was with defendant the day of the occurrence; that defendant yelled "BD" to a group of people who responded "GD," after which defendant fired his gun about five times; and that he knew the initials "BD" designated a street gang. Taylor did not know whether black and blue were "gangster colors," but acknowledged that he wore those colors the previous day.

Chicago police officer James Hardaway testified that on February 26, 1990, during a conversation with Brown regarding an incident un-

related to the shooting, she provided him with information that prompted him to contact Area 3 violent crimes.

Chicago police officer John O'Mara testified he received this call from Officer Hardaway and interviewed Brown, who gave him the names of defendant and Quintius Taylor. On March 7, 1990, having obtained a warrant for defendant's arrest, O'Mara and his partner, Officer Phillip Collins, proceeded to a courthouse on Chicago Avenue, after learning defendant was there. When they arrived, defendant was already in custody of Officer Craig Cegielski. Cegielski was breathing heavily, his clothing was disheveled, and his glasses were broken. Defendant was transported to headquarters and viewed in a lineup by Prince.

Chicago police officer Phillip Collins testified he was Officer O'Mara's partner and was present at the lineup. When Prince saw defendant, he jumped up and said "[t]hat's him, that's the son of a bitch *** I'll never forget his face."

Officer Craig Cegielski testified that on March 7, 1990, being aware that a warrant had been issued for defendant's arrest, he went to the courthouse on Chicago Avenue when he learned defendant was there. He saw defendant in the hallway, informed him of the warrant, and instructed him to put his hands on the wall. Defendant initially complied; but as Cegielski reached for his handcuffs, defendant turned and punched him in the face, rib cage, and knee, and attempted to kick him in the groin. A struggle ensued, but Cegielski eventually subdued defendant. Officers Collins and O'Mara subsequently arrived and assisted in transporting defendant to headquarters.

Defense witness Chicago police officer Martin Lee testified that, in the emergency room following the shooting, Prince described his assailants simply as two male blacks, one of whom wore an eskimo coat. Lee was uncertain whether the term "eskimo coat" was actually used by Prince or was his interpretation of Prince's description.

Greg Jackson, called by the defense, testified that he resided in an apartment on the northeast corner of 72nd and Green. About the time of the occurrence, Jackson saw a group of men conversing near his apartment while another two men approached on Green Street. One of the two men, wearing a "sky-blue jacket," raised his arm and began shooting. Jackson was unable to see the men's faces and was unable to identify defendant as the shooter.

The State inquired on cross-examination "what type of neighborhood" it was and Jackson responded "terrible," that there were drugs and gangs; he had heard the terms "BD" and "folks" before, and heard them "every day" walking down his street.

Defendant testified on his own behalf. On the date of the occurrence, he lived at 6859 South Throop Street with his girlfriend, Edna Johnson. He is a member of the Black Disciples street gang. It is not unusual for people his age in his neighborhood to be involved with gangs. Defendant denied knowing decedent, denied shooting decedent or Prince, denied being in the area of 72nd and Green when the shooting occurred, but could not recall where he was at that time. Defendant admitted knowing Taylor, who is also a Black Disciple. Defendant requested that Brown move out of 7108 South Green because she was stealing items from the apartment.

Defendant testified to the circumstances of his arrest, stating that he was in a courthouse on March 7, 1990, when someone grabbed him by the back of his neck. The man was not uniformed and did not identify himself as a policeman. Defendant turned around and hit him. Defendant denied telling Brown that "the police aren't going to take me alive," or words to that effect.

After the jury found defendant guilty of murder and attempted murder, he was sentenced to 45 years' imprisonment for murder, and 25 years for attempted murder.

## I

Defendant contends that the State's repeated reference to the pervasiveness of gangs in the area of the shooting, and to defendant's gang membership, was extremely prejudicial and totally irrelevant in light of the scant evidence suggesting the offense was gang-related. Specifically, defendant disputes the extensive testimony by Green regarding gang classification, colors, symbols and funerals; Brown's testimony of defendant's membership in the Black Disciples; the cross-examination of Taylor concerning gang initials and colors; and defendant's cross-examination regarding initials, colors, slogans, symbols, tattoos and the like.

Although a deep and widespread public prejudice may exist against street gangs, gang-related evidence will not necessarily be excluded if it is otherwise relevant and admissible. (*People v. Gonzalez* (1991), 142 Ill. 2d 481, 489, 568 N.E.2d 864; *People v. Smith* (1990), 141 Ill. 2d 40, 58, 565 N.E.2d 900; *People v. Hairston* (1970), 46 Ill. 2d 348, 372, 263 N.E.2d 840.) "An accused may not insulate the trier of fact from his gang membership where it is relevant to a determination of the case, simply because prejudice attaches to that revelation." (*People v. Rivera* (1986), 145 Ill. App. 3d 609, 618, 495 N.E.2d 1088.) Evidence indicating defendant's gang affiliation or involvement in gang-related activity is admissible to show common purpose or design,

or to provide a motive for an otherwise inexplicable act. (*Smith*, 141 Ill. 2d at 58; *People v. Hairston*, 46 Ill. 2d at 372.) Such admissibility is premised, however, upon proof that gang membership or activity is related to the crime charged. (*Smith*, 141 Ill. 2d at 58.) It is the circuit court's function to weigh the probative value of such evidence against its prejudicial effect in determining whether it should be admitted; the court's decision on this issue will not be reversed on appeal absent an abuse of discretion. See *Gonzalez*, 142 Ill. 2d at 489.

The State has no obligation to prove motive to sustain a murder conviction; nevertheless, any evidence tending to show that an accused had a motive for killing the deceased is probative because it makes more probable the fact that the accused did kill the deceased. (*Smith*, 141 Ill. 2d at 56.) Such evidence is competent when it tends to establish the existence of the motive relied upon; when the State undertakes to prove facts purportedly demonstrating motive, the accused must be shown to have known of these facts. *Smith*, 141 Ill. 2d at 56.

Initially, we note that defendant has waived any dispute regarding his cross-examination by failing to object thereto either at trial or in a post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 199, 522 N.E.2d 1124.) Although an exception to the waiver rule will be applied when the evidence is "closely balanced," in order to correct grave errors involving fundamental fairness (*People v. Thurman* (1984), 104 Ill. 2d 326, 329-30, 472 N.E.2d 414), this exception is inapplicable here, because the evidence in this case was overwhelming despite defendant's cross-examination testimony. Additionally, it is not likely that the evidence prejudiced defendant, in light of his cavalier admission on direct examination, that he was a member of the Black Disciples, which, having thousands of members, was "one of the largest" gangs around.

■ The assailant's identity was a critical issue in the case at bar, and the most telling evidence of this question was the fact that the shooter shouted "BD" before firing his weapon. The evidence regarding the Black Disciples, including the extent of their activity in the neighborhood, was therefore relevant not only to give meaning to the term "BD," but to establish a motive for a seemingly unprovoked, inexplicable killing. Further, Brown's testimony that defendant, a Black Disciple, had bragged around the time of the occurrence that he had "just killed two pussy motherfuckers" served to link defendant to the gang as well as to the occurrence. For these reasons, the gang evidence was properly admitted.

Defendant also claims excessive reference was made to gangs during closing and rebuttal argument, and disputes the State's characterization of him as "the big bad bragging gangbanger" and "the big stuff gangbanger."

Again, defendant failed to raise these objections before the circuit court, and therefore waived them; in any event, his claims lack merit. Prosecutors are allowed great latitude in closing argument, and the circuit court's determination of the propriety of argument will be upheld absent a clear abuse of discretion. (*People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 322, 379 N.E.2d 847.) Both parties have a right to comment on the evidence and to draw any legitimate inferences therefrom. (*Weatherspoon*, 63 Ill. App. 3d at 322.) If evidence regarding gangs and gang membership was properly admitted during the trial, it is subject to comment during closing argument. See *Gonzalez*, 142 Ill. 2d at 491.

■ The record shows that each of the disputed remarks was simply a review of properly admitted evidence. As stated above, gang evidence was relevant to establish the shooter's motive and identity, and there was nothing in closing argument that constituted an unjustified characterization of the evidence here. This case involved 14 witnesses and much evidence; the State gave equal attention to all this evidence in its closing. The reference to gang colors and to defendant as a "big bragging gangbanger" derived from his alleged admission to Brown that he just killed two "motherfuckers," and from his subsequent comment that she wear "royal blue silk" to his funeral.

Assuming, *arguendo*, that the gang evidence was somewhat cumulative, it seems highly unlikely that this prejudiced defendant in light of his own admissions, both to Brown and on the witness stand. In response to his own attorney's questioning, defendant admitted his gang membership, and responded without objection to each of the State's questions regarding gang colors, slogans and whether he wore a gang tattoo; indeed, the record indicates he wore gang colors on each day of the trial. His argument, therefore, is without merit.

## II

Defendant next alleges error in the State's inquiry, over his objection, during his cross-examination as to whether a past gunshot wound, unrelated to the charges at bar, was due to his gang activity.

The State commenced its cross-examination of defendant with the following:

"Q. Anybody ever shoot at you, Raymond?
A. No.

Q. No?
A. I've been shot, [but] nobody ever shot at me.
***
Q. You say you have been shot?
A. Yes, I have.
Q. Was that as part of your gang activity?
MR. GIOVANNINI [Defense counsel]: Objection, Judge.
THE COURT: Overruled.
THE WITNESS: Excuse me?
Q. [Assistant State's Attorney]: Was that as part of your gang activity that you were shot?
A. No, it wasn't.
Q. Had nothing to do with gangs?
A. No, it did not.
Q. Did you ever tell anybody that shooting had something to do with gangs?
A. No, I did not.
MR. GIOVANNINI: Objection.
THE COURT: Oh, I'll allow the answer to stand."

Defendant contends this questioning had no relevance to this cause, conveyed to the jury that defendant had a propensity toward violence, and only served to compound the error in allowing extensive testimony relating to gangs and gang membership. Further, defendant contests the State's failure to perfect this questioning by introducing rebuttal evidence to support it.

Evidence of other crimes or misconduct is admissible only if relevant to show criminal intent, common design, identity and motive, rather than a mere propensity on defendant's part to commit the offense charged. (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 485 N.E.2d 1292; *People v. Henenberg* (1976), 37 Ill. App. 3d 464, 346 N.E.2d 11.) Even if relevant, such evidence is only admissible if its probative value clearly outweighs its prejudicial effect. (*People v. Gordon* (1981), 94 Ill. App. 3d 764, 767, 419 N.E.2d 66.) A reference to prior criminality does not require reversal in all circumstances; unless there is a reasonable probability that improperly admitted evidence contributed to the conviction or influenced the jury's determination of guilt, reversal is unnecessary. (*Schneble v. Florida* (1972), 405 U.S. 427, 432, 31 L. Ed. 2d 340, 345, 92 S. Ct. 1056, 1059-60; *Henenberg*, 37 Ill. App. 3d at 469; see also *People v. Tranowski* (1960), 20 Ill. 2d 11, 17, 169 N.E.2d 347.) Application of the harmless error rule here requires an assessment of the probable impact of the evidence on the minds of the average jury. (*Henenberg*, 37 Ill. App. 3d at 469.) Rever-

sal is unwarranted where the evidence otherwise proves defendant's guilt beyond a reasonable doubt. *Tranowski*, 20 Ill. 2d at 17.

▮ Initially, we note that the State did attempt to introduce evidence to prove up defendant's impeachment here, albeit in a somewhat untimely manner. Based upon defendant's objection, however, the court disallowed the evidence finding that it was collateral. In any event, assuming *arguendo* that the questioning was improper, the error was harmless. As demonstrated above, the evidence of defendant's guilt here was overwhelming. Furthermore, defendant admitted he was a member of the Black Disciples. He testified regarding the gang symbol and colors, admitted he wore gang tattoos, and wore gang colors during trial. He bragged to Brown about his gang membership. In light of defendant's statements and conduct, the questions casting light on defendant's own victimization caused no further prejudice. See *Henenberg*, 37 Ill. App. 3d 464, 346 N.E.2d 11.

### III

Prior to trial, defendant moved *in limine* to exclude for impeachment purposes any reference to the nature of his prior felony conviction, which was for possession of a controlled substance with intent to deliver. The circuit court denied the motion, finding that the crime was not sufficiently similar to the crime charged to prejudice defendant.

On appeal, defendant does not assign error to the denial of this motion; rather, he argues he was deprived of his right to a fair trial and due process when the State subsequently elicited testimony from Green and Jackson linking gangs with drug dealing in the neighborhood, and commented on this connection twice during closing argument.

In *People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695, the supreme court held that evidence of a prior felony conviction is admissible to attack the credibility of a witness as long as the conviction or defendant's release from confinement occurred no more than 10 years prior to the trial in which the felony evidence is proffered. (*Montgomery*, 47 Ill. 2d at 516, 519; see also Ill. Rev. Stat. 1989, ch. 38, par. 155—1.) Introduction of such evidence is limited to the purpose of impeachment, and not to prove the defendant's propensity to commit the crime charged; when the conviction shows propensity more than lack of credibility, the evidence should not be allowed. (*People v. Siebert* (1979), 72 Ill. App. 3d 895, 902, 390 N.E.2d 1322.) Defendant concedes that the ruling on the motion *in limine* was "perfectly logical" at the time it was made "in light of the fact that there

should have been absolutely no mention of drugs, drug dealing, or their connection with local gangs" in this case. Once the State knew of the ruling, however, it succeeded in "bringing through the back door" an inference that because defendant was a convicted drug dealer and gang member, and the local gangs were the source of drug dealing and the cause of the offense at bar, the defendant was the "perfect suspect" for this crime.

■ Defendant principally relies on Green's description of the neighborhood as a "drug ridden war zone," "infested with gang activity." The record suggests, however, that the State did not purposefully elicit this testimony and, in any event, that the testimony probably did not harm defendant. Green gave the above responses when the State asked him generally to describe the neighborhood around the time of the offense; the inquiry made no allusion to drugs. Green's answer did not link defendant, or even the gangs, to this chronic drug dealing. It simply described the neighborhood. Moreover, following a defense objection, the State never again mentioned drugs during Green's testimony.

Defendant also complains of the cross-examination of defense witness Jackson, who described the neighborhood as "terrible," as having "drugs and everything which is in every neighborhood," as well as "gangs." Again, the questions merely asked for a description of the witness' neighborhood; they did not necessarily link drugs to gangs, or to defendant. It requires a strained inference to construe this testimony as demonstrating that defendant had a propensity to commit murder.

Defendant similarly takes issue with a statement in the State's closing argument, in relevant part as follows:

> "But he doesn't just throw away the gun he still has the gun [*sic*], he is a gangbanger, he's not going to throw away a good gun he's just going to get rid of the shells he used.
>
> But, in any event, no one said this guy is smart. He is nothing like Kevin Green from that same neighborhood. I mean, does he sound real smart, you heard him on the stand, the type of character he is. I mean you know a little bit about him now, you know a little bit about his background. You know about his felony conviction for possession of controlled substance with intent to deliver."

Defendant's argument lacks merit. Soon after this statement, the State suggested that the felony evidence was to be considered on the issue of defendant's credibility. The comment itself refers to defendant's conviction in context of his character. Defendant also attacks a

subsequent statement in which the State said drug trafficking in the neighborhood, along with gangs, was a "way of life."

Defendant does not allege prosecutorial misconduct, but merely implies that the resulting effect of the cumulative evidence prejudiced him. Neither this comment alone, nor the witness' testimony regarding the instance of drugs, portrayed defendant as having a tendency toward murder. Accordingly, this argument is unpersuasive.

## IV

Defendant next contends the court erred in denying his motion *in limine* to exclude reference to the fact that he was exiting a courtroom located above a police station at the time of his arrest, because he was present there for an offense totally unrelated to the case at bar. Defendant argues that this error "aggravates and compounds" the errors alleged above.

Evidence of other crimes or misconduct by an accused is not admissible if offered simply to show he is criminally predisposed. (*Henenberg*, 37 Ill. App. 3d at 468.) In considering what constitutes "other crimes" evidence, direct proof of a criminal act is not necessary; it is sufficient that the evidence could lead the jury to infer prior criminality on defendant's part. (*Henenberg*, 37 Ill. App. 3d at 468.) Illinois courts have denounced evidence which, without independent relevance, implies that defendant was well known by police because of frequent presence both at headquarters and in court. *People v. Blakely* (1977), 50 Ill. App. 3d 536, 542-44, 365 N.E.2d 996; see also *People v. Cherry* (1971), 130 Ill. App. 2d 965, 267 N.E.2d 744.

In the case at bar, Brown testified that defendant told her on the night of the shooting that the police would have to kill him in order to take him back to prison. To corroborate this testimony, the State presented evidence of defendant's arrest, during which he punched and kicked Officer Cegielski. In denying defendant's motion to exclude reference to the location of the arrest, the court stated as follows:

> "I will allow them to indicate the location of the arrest and to describe the circumstances ***.
>
> Again if you want I will certainly give the jury a limited instruction at that point that the location of the arrest is not to be considered in any way other than establishing where the arrest occurred. But I think under those circumstances I would allow [*sic*] because it is a circumstance to attempt to flee maybe on the street is different than attempting to plea [*sic*] in a

courthouse although I will certainly indicate that the State cannot go into the fact as to why he was there."

According to the State, the court properly found relevance in the fact defendant resisted arrest in a courthouse, because this deterred defendant from having a gun as he had predicted in his conversation with Brown.

At trial, brief references to the courthouse or police station were made in the testimony of Officers O'Mara, Collins, and Cegielski in context of the circumstances leading to the arrest. The State made similar references in its closing and rebuttal arguments. Nevertheless, no mention was made of the reason defendant was at the courthouse; there was no suggestion that he was present in response to allegations against him. When the testimony was first commenced, the court interrupted to instruct the jury that the evidence was to be received for a limited purpose, and that no significance was to attach to the fact that it was a court facility. Defendant's mere presence in a courthouse on one occasion does not require an inference of criminal activity on his part. Defendant's argument here lacks merit.

## V

Defendant lastly argues that the court erred in overruling his objection to the State's "repeated questioning," during his cross-examination, regarding his failure to call a potentially exonerating witness.

Defendant testified during direct examination that he could not recall his whereabouts on January 3, 1990, at the time of the occurrence. On cross-examination, defendant admitted he told police the night of his arrest that he was at home with his girlfriend, Edna Johnson, at the time of the shooting, and stated that he "misspoke" at that time. The following colloquy then took place:

"Q. Edna Johnson?

A. Right.

Q. She was your girlfriend?

A. Right.

\* \* \*

Q. Is she here today?

A. I don't see her.

Q. The person that you say you were with at home January the 3rd, 1990, the night that you don't remember is not here. You don't see her, right?

MR. GIOVANNINI: Objection, Judge \* \* \* [a]sked and answered.

THE COURT: Overruled, [*sic*] it has been asked and answered."

Defendant maintains this questioning was reversible error because he had not asserted an alibi defense, and "the obvious inference" raised by these questions was that, since she was not present in court, her testimony would have been unfavorable to him.

■ When a party specifically objects to certain evidence, all grounds not specified are waived. (*People v. Eyler* (1989), 133 Ill. 2d 173, 549 N.E.2d 268.) As the foregoing reveals, defendant objected only on the ground that the question had been asked and answered. Therefore, he waived the issue on appeal. 134 Ill. 2d R. 615(a).

Were we to consider this issue, any error in the State's questioning was harmless in light of the overwhelming evidence against defendant, and in view of the fact that the State ceased all reference to the absence of the witness after defendant's objection.

For the foregoing reasons, the jury's conviction of defendant cannot be disturbed and the judgment of the circuit court must be affirmed.

Affirmed.

DiVITO and McCORMICK, JJ., concur.