No. 2--94--0961

_________________________________________________________________

                                  IN THE

                        APPELLATE COURT OF ILLINOIS

                              SECOND DISTRICT

_________________________________________________________________

THE PEOPLE OF THE STATE         )  Appeal from the Circuit Court

OF ILLINOIS,                    )  Winnebago County. 

                                )  

     Plaintiff-Appellee,             )

                                     )  No. 93--CF--1174

v.                                   )

                                )

PATRICK A. PURSLEY,                  )  Honorable

                                )  Robert G. Coplan,

     Defendant-Appellant.       )  Judge, Presiding.

_________________________________________________________________

     JUSTICE COLWELL delivered the opinion of the court:

     Defendant, Patrick Pursley, appeals his conviction of first

degree murder.  Pursley contends (1) the State did not prove beyond

a reasonable doubt that he committed murder; (2) prejudicial and

irrelevant evidence was improperly admitted; (3) the prosecutor

engaged in purposeful misconduct in his opening statement; (4) the

court failed to determine the voluntariness of a prior inconsistent

statement; and (5) his sentence of natural life imprisonment is an

abuse of discretion.  We affirm.

     On April 2, 1993, at approximately 10 p.m., Andrew Asher and

his girlfriend, Becky George, were seated in a parked car in front

of George's brother's apartment in Rockford.  As they were talking,

a man approached the driver's door, where Asher was seated, and

pulled it open.  The man pointed a gun at Asher and George and

said, "This is a stickup, hand me your money."  George grabbed

about $60 from her purse and leaned over to put it on Asher's lap,

and Asher reached into his pocket for his wallet.  George testified

that she held the money in her hand stretched out toward the

robber, but that he did not take it.  She began to look for more

money in her purse when she heard two "noises that were like pops." 

She turned toward Asher and saw him slouch down.  Then, George

stated that the robber turned toward the east and ran.  George

looked at Asher and noticed that he had been shot, so she ran to

her brother's apartment and called the police.

     The Rockford police did not find any suspects in the area, but

did find a spent bullet in the car.  Additionally, the county

coroner recovered a bullet from Asher's shoulder.  A forensic

scientist examined the bullets and determined them to be of 9

millimeter caliber fired from the same firearm.    

     George told the police that the man was wearing dark clothing

and that she vividly remembered the man was wearing a blue ski mask

with a hood over the mask.  She also said that she saw black skin

around the eyes.

     On June 8, 1993, Marvin Windham called Crimestoppers about

Asher's murder.  He stated that he had visited Pursley the day

after the murder and that Pursley told him that he killed Asher. 

Windham did not give his name.

     On June 10, 1993, Officer Mark Schmidt and four other police

officers set up a surveillance of an apartment the defendant shared

with Samantha Crabtree.  At 1:25 p.m., Pursley and Crabtree entered

a vehicle and Crabtree started driving.  The officers followed in

an unmarked van.  While they were following the vehicle, the

vehicle stopped suddenly and Pursley jumped out of the car and

began running.  The police attempted to pursue, but lost him. 

Crabtree voluntarily agreed to go to the police station.

     On the way to the station, the police stopped at Crabtree's

apartment and conducted a search pursuant to a valid search

warrant.  The police recovered a 9 millimeter gun, a black hooded

sweatshirt, black jeans, and a document from the Illinois

Department of Employment Security with Pursley's name on it. 

     At the station, Crabtree told the police that Pursley told her

that if she ever said anything to the police he would kill her.  At

approximately 6 p.m., Crabtree took the police on the route Pursley

and Crabtree took the night of Asher's murder.  When they returned

to the station, Crabtree made a statement outlining the events

before, during, and after the murder.  According to the statement,

Crabtree and Pursley were out driving around to look for a house

for Pursley to rob.  She stated that Pursley was wearing black

combat boots, black jeans, a black hooded sweatshirt, and had a

navy blue ski mask with him.  After they passed some apartments,

Pursley told her to pull over to the side of Silent Road and wait

there with the car running.  Crabtree stated that Pursley exited

the car and walked back toward the apartments they had just passed. 

Two or three minutes later, she heard gunshots.  A minute later,

Pursley returned to the car and told her to drive.

     Crabtree stated that when Pursley returned to the car he was

carrying her 9 millimeter gun in his hand.  She said that while she

was driving home she made several wrong turns because she was

nervous and that Pursley threatened several times to kill her. 

When they arrived at her apartment, Crabtree said that Pursley took

what "looked like" about $100 from his pocket.  She stated that 

later that night she and Pursley saw a news report concerning

Asher's death, and Pursley told her not to say anything to anyone. 

     On June 12, 1993, Windham called Crimestoppers again after

hearing that the police were unable to arrest Pursley on June 10. 

He also gave a statement to the police.

     On June 16, 1993, the police received a call from

Crimestoppers that a suspect by the name of Patrick Pursley was

walking around the Fairground housing projects.  The police

searched the area, but could not find Pursley.  The police then

received another Crimestoppers call that the suspect was just seen

running northbound.  While searching the area, an officer observed

a person hiding under a ramp of an abandoned building.  The police

pulled out the person, who was Pursley, and arrested him.

     At trial, George testified to the events of that evening, and

a ballistics expert testified that the 9 millimeter gun the police

found at Crabtree's apartment was the weapon used in Asher's

murder.  Diane Winters, a friend of Pursley, testified that Pursley

called her a month before Asher's murder and asked if she would buy

bullets for Crabtree's gun.  

     Windham testified that he visited Pursley early in April 1993,

at which time Pursley showed him a newspaper clipping about the

murder and told Windham how he had robbed Asher and George and then

killed Asher.  On cross-examination, Windham stated that he had

received a total of $2,650 in reward money for his information. 

Additionally, Windham said that the reason he waited two months

after learning Pursley was the murderer before calling

Crimestoppers was because Pursley did not threaten him until June

1993.  Windham also admitted that he had two criminal charges

currently pending against him.

     Crabtree's testimony at trial contradicted her June 10, 1993,

statement and her testimony before the grand jury.  At trial, she

stated that her prior two statements were coerced and that she and

Pursley did not leave her apartment on April 2, 1993.

     Several witnesses testified to the whereabouts of Pursley on

April 2.  Myra Foster, the grandmother of Pursley's nine-year-old

son, Anthony, and Tracy Foster, Anthony's mother, testified that on

April 2 Pursley was in Rockford with his son and Aaron, Myra's

seven-year-old son.  However, on cross-examination they admitted

that two weeks before their testimony they told the police that

they were not sure that Pursley came to Myra's home on April 2.  

     Penny Bunnell, a friend of Mrs. Foster, testified that on

April 2, 1993, she was visiting Mrs. Foster when Pursley came and

picked up Anthony and Aaron for a visit around 5:30 p.m. that day. 

     

     Eleven-year-old Aaron Davis and ten-year-old Anthony Pursley

testified that Pursley took them to his house the night of April 2. 

They both stated that they and Pursley played with Anthony's

chemistry set until 11 p.m. on April 2 and that Pursley never left

the house.  On cross-examination, however, Aaron stated that he

thought that April 2 was a Saturday.  Also, they both admitted that

they told the police two weeks before their testimony that Pursley

had picked them up in the afternoon, not at night.  

     Sixteen-year-old David Bodell testified that he lived in the

neighborhood where Asher was murdered.  He stated that on April 2,

1993, he heard three gunshots and a woman scream.  He said that

"not too long" afterward he walked outside and saw a man crouched

down in front of a dumpster that was located about 30 feet  from

him.  Bodell testified that the man began running toward an open

field and Silent Road Trail when the police sirens "started

coming," which was about 30 or 40 seconds after he saw the man.  He

said that the man was about 6 feet 3 inches tall and that he could

not tell if the man was black or white.  On cross-examination,

Bodell stated that the man was "either a white male with a very

dark tan or possibly black."  Additionally, Bodell stated that he

told a police officer on April 3, 1993, that the man was wearing a

dark blue sweatshirt and black jeans and ran in a southeasterly

direction across a field after hearing the police sirens.  

     Finally, Pursley presented his own ballistics expert, who

testified that he was unable to make a conclusive identification

that the bullets from the scene were fired from Crabtree's gun.  

     On rebuttal, a police officer stated that the distance between

where Bodell showed him he was standing to the dumpster was about

100 feet and that Bodell told him that the man was black.  

     The jury found the defendant guilty of first degree murder. 

At sentencing, the court noted Pursley's "long history of criminal

conduct" and sentenced him to natural life without parole.

     We turn first to Pursley's claim that the jury improperly

heard evidence that tended to show that he had the propensity to

commit other crimes.  Evidence is relevant if it has any tendency

to make the existence of a material fact more or less probable than

it would be without the evidence.  People v. Williams, 228 Ill.

App. 3d 981, 989 (1992).  Indeed, evidence will not be excluded

merely because it may prejudice the accused.  People v. Calderon,

98 Ill. App. 3d 657, 661 (1981).  It is within the discretion of

the trial court to decide whether evidence is relevant and

admissible.  People v. Hayes, 139 Ill. 2d 89, 130 (1990). 

Consequently, a trial court's determination of whether evidence is

relevant and admissible will not be reversed absent a clear abuse

of discretion resulting in manifest prejudice to the defendant. 

People v. Nichols, 235 Ill. App. 3d 499, 506 (1992).

     Pursley points this court to statements made by three 

witnesses.  First, Pursley argues that Ms. Winter's testimony

regarding his request that she buy bullets for Crabtree's gun

because he did not want the bullets traced to him was extremely

prejudicial and served no purpose other than to show that Pursley

had the propensity to commit violent crimes in the month before

Asher was killed.  We disagree.  Evidence that tends to prove a

fact in issue is admissible even though it may be evidence showing

that the accused has committed a crime other than the one for which

he is being tried.  People v. McDonald, 62 Ill. 2d 448, 455 (1975). 

Moreover, while evidence may not be introduced solely to show a

defendant's propensity to commit a crime, the State may offer

testimony relating to events that are not themselves criminal

offenses that go to the motive and intent of the defendant.  People

v. Rachel, 123 Ill. App. 3d 600, 605-06 (1984).

     We agree with the trial court that Ms. Winter's testimony was

relevant and did not raise any inference of a propensity to commit

a crime.  The State presented evidence through a ballistics expert

that Crabtree's 9 millimeter Taurus gun was the firearm involved in

the murder.  Ms. Winter testified that Pursley asked her to buy

bullets for Crabtree's 9 millimeter gun.  A substantial part of

Pursley's defense was denying that the 9 millimeter Taurus gun

found in Crabtree's apartment was connected to him.  Ms. Winter's

testimony, however, established that Pursley was aware of

Crabtree's gun.  Further, her testimony established the

availability and proximity of the gun to Pursley.  As a result, we

find that the trial court did not abuse its discretion by

determining that Ms. Winter's testimony helped show that Pursley

had access to the alleged murder weapon.

     The second instance of alleged misconduct involves statements

by Windham.  During cross-examination, the defense asked Windham

about the alleged threats Pursley made to him in June that led to

Windham's calling Crimestoppers.  On redirect examination, the

prosecutor questioned Windham about what Pursley said to him, and

Windham replied, "He said before he go back to the penitentiary he

will know who told, either me or [Crabtree], and he will--."  The

defense objected to Windham's statement, and the court overruled

the objection.  On appeal, Pursley argues that Windham's statement

was improper because it showed his propensity to commit crimes.  We

disagree.  A defendant is entitled to have his guilt or innocence

determined solely with reference to the crime charged.  People v.

Gregory, 22 Ill. 2d 601, 603 (1961).  Accordingly, it is well

settled that evidence of other offenses unrelated to the crime for

which a defendant is on trial is incompetent.  People v. Goodwin,

69 Ill. App. 3d 347, 349 (1979).  However, it is also well settled

that a party who "opens the door" on a particular subject is barred

from objecting to questioning based upon the same subject.  People

v. Griffiths, 112 Ill. App. 3d 322, 328 (1983).

     We find that the court did not abuse its discretion by

admitting Windham's testimony because the defense "opened the door"

by calling into question this issue.  From reviewing the

transcripts of the trial in this case, it is clear that the defense

strategy was to show that Windham created his story concerning

Pursley to capture reward money and to gain assistance with other

criminal matters.  The defense repeatedly asked whether Windham

invented his story after reading newspaper articles about the case

and asked him about his prior drug use and current problems with

the law.  Further, the defense questioned Windham about the reward

money he received and why he waited two months before calling

Crimestoppers.  Finally, the defense asked Windham about Pursley's

threat several times and implied that Windham had made up his

entire meeting with Pursley to make money. 

     When the State attempted to rehabilitate its witness, the

defense objected to Windham's testimony stating how Pursley

threatened him.  We find that, by questioning Windham's credibility

and his testimony that Pursley threatened him, the defense opened

the door regarding Pursley's threat to Windham.  See People v.

Dent, 266 Ill. App. 3d 680, 687 (1994) (defense "opened the door"

to the prosecutor's rehabilitating his witness by informing the

jury that the witness did not have a criminal record, and made

prior consistent statements, because defense strategy was to

implicate the witness in the murder and show that the witness was

an original suspect and had omitted pertinent information when

giving his statement to the police).  Thus, in the present case we

find that the trial court did not abuse its discretion by refusing

to grant a mistrial or strike Windham's testimony.  

     Pursley argues that another statement by Windham also amounts

to prejudicial error.  When discussing Pursley's threat on redirect

examination, Windham also stated that Pursley told him that if

Windham wanted to continue to visit with Pursley, Windham would

have to "start doing crimes" with him.  The defense objected to

this testimony, and the court sustained the objection.  Then, the

court instructed the jury to disregard the answer.  Pursley,

however, contends that the instruction did not cure the error and

the statement denied him a fair trial.  We disagree.  First, we

find that Windham's statement was not "highly prejudicial" and note

that there is nothing in the record to show that the jury did not

follow the court's instruction.  See People v. Jones, 222 Ill. App.

3d 206, 211 (1991).  Second, we find that the comment concerned

Pursley's threat, to which the defense opened the door as

previously discussed.  Accordingly, Windham's second statement does

not amount to prejudicial error warranting a reversal.

     The next instance of alleged error concerns the testimony of

Officer Ronald Gillardo, who testified to the circumstances

surrounding Pursley's arrest.  Pursley argues that Officer

Gillardo's testimony that he was hiding under a ramp when he was

arrested was substantially prejudicial.  Pursley also contends that

Officer Gillardo's testimony of the Crimestoppers tip--"that a

suspect by the name of Patrick Pursley wearing dark clothing

carrying a shotgun was walking"--denied him a fair trial because it

showed that he had a propensity to commit other crimes.  We

disagree.  Other crimes evidence is properly admitted to show

identity, absence of mistake, defendant's state of mind, and the

circumstances of his arrest.  People v. Wilson, 257 Ill. App. 3d

826, 831 (1994).  Moreover, evidence of other crimes is admissible

when it is relevant to the police investigation of the offense at

issue where such investigatory procedures involved an integral part

of the circumstances of the defendant's arrest.  People v. Davis,

93 Ill. App. 3d 187 (1981).  Indeed, evidence of flight is

admissible as a circumstance tending to show a consciousness of

guilt.  People v. Harris, 52 Ill. 2d 558, 561 (1972).  Overall, the

determination of the admissibility of evidence, including evidence

of other crimes, rests within the discretion of the trial court,

and that decision will not be reversed absent a clear abuse of

discretion.  People v. Holloway, 225 Ill. App. 3d 47, 51 (1991).  

     We find that the court did not abuse its discretion by

admitting Officer Gillardo's testimony regarding the events leading

up to Pursley's arrest.  The State presented evidence that the

police chased Pursley on June 10, 1993, after he ran from

Crabtree's vehicle, but that they lost him.  Consequently, on June

12, 1993, Pursley knew that the police were looking for him, and

testimony that he was hiding is relevant to show Pursley's

consciousness of guilt.  Further, Officer Gillardo's reporting the

context of the Crimestoppers tips solely recounts the police

procedure in apprehending Pursley.  The tips led the police to

Pursley by telling them that a man known as Pursley was wearing

dark clothing and holding a shotgun in a certain area of the city. 

Accordingly, the tips were relevant to show identification and the

procedure used to arrest Pursley.  

     Finally, aside from Officer Gillardo's testimony, no evidence

was presented concerning whether Pursley possessed a shotgun when

he was arrested, or whether he committed a crime with the shotgun. 

Officer Gillardo merely recounted the circumstances surrounding

Pursley's arrest and how the police located and identified Pursley. 

Therefore, we find that the events leading up to Pursley's arrest

were relevant, even if they were also prejudicial, and conclude

that the court did not abuse its discretion in allowing Officer

Gillardo to testify to these events.            

     Pursley's second contention is that the prosecutor engaged in

misconduct in his opening statement by referring to Pursley as an

"executioner," which denied him a fair trial.  A prosecutor may

make unfavorable comments about the accused.  He may also make

statements and arguments and draw reasonable inferences that are

based on the proofs in the case in front of the jury.  He may even

go so far as to " 'denounce [the accused's]  wickedness.' "  People

v. Terrell, 62 Ill. 2d 60, 64 (1975).  On the other hand,

prosecutors may not engage in inflammatory arguments designed

solely to arouse the passions of the jury.  People v. Johnson, 119

Ill. 2d 119, 139 (1987).  Nevertheless, improper remarks generally

do not constitute reversible error unless they result in

substantial prejudice to the accused.  People v. Tiller, 94 Ill. 2d

303, 321 (1982). 

     In Terrell, the prosecutor referred to the defendant as a

punk.  The supreme court stated that the definition of punk was a

ruffian or hoodlum and that the conclusions the prosecutor made

could well have been within the dictionary definition of the words

used.  Indeed, the court noted that the language was "needlessly

harsh," but affirmed the appellate court's ruling that the comment

did not warrant reversible error.  Terrell, 62 Ill. 2d at 64.

     In the present case, the prosecutor referred to Pursley as an

"executioner" in his opening statement.  According to the

dictionary, an executioner is "one that puts to death."  Webster's

Third New International Dictionary 794 (1971).  From the facts in

this case, we find that the prosecutor could have drawn this

inference.  Moreover, we do not believe that the word "executioner"

carries the same connotation as other remarks found to be

reversible error.  See Tiller, 94 Ill. 2d at 320-21 (prosecutor

referred to defendant as an animal and compared the crime to the

Nazi holocaust); People v. Payton, 72 Ill. App. 2d 240, 249-50

(1966) (prosecutor made numerous improper remarks, one of which

referred to the defendant as a beast). 

     In this case, the prosecutor used the word "executioner" once,

and this occurrence was in his opening statement.  Consequently,

the word at issue was an isolated remark that was not dwelled upon

further by the prosecutor.  See Johnson, 119 Ill. 2d at 140

(prosecutor's improper remark was an isolated incident that did not

constitute reversible error).  Moreover, in his opening statement,

defense counsel reiterated that opening statements were not

evidence, but that opening statements are only a "sketch of what

*** the evidence [the prosecutor] believes will show."  Indeed,

defense counsel even addressed the jury concerning the prosecutor's

use of the word executioner and warned the jury not to let

"emotions and sympathy" get in the way of Pursley's right to a fair

trial.  Thus, we find that the prosecutor's remark, even if it was

inappropriate during the opening statement, does not constitute

reversible error because it was not a material factor in Pursley's

conviction.  

     Next, Pursley contends that Crabtree's June 10, 1993,

statement to the police and her grand jury testimony were

erroneously admitted into evidence.  Pursley concedes that these

statements meet the statutory requirements of section 115--10.1 of

the Code of Criminal Procedure of 1963 (Code) (735 ILCS 5/115--10.1

(West 1994)) for admission of prior inconsistent statements, but

argues that, because the court did not make an initial

determination regarding the voluntariness and reliability of the

statements, Pursley's due process rights were violated.  We

disagree.  The fact that a statement is admissible under section

115--10.1 of the Code already demonstrates its reliability, so no

additional evidence of the statement's reliability need be shown. 

People v. Carlos, 275 Ill. App. 3d 80, 84 (1995).  

     The facts of Carlos parallel the facts in the present case. 

In Carlos, the defendant argued that a trial court must make a

finding that a prior inconsistent statement is reliable and

trustworthy in addition to finding that the statement meets the

Code's requirements.  The appellate court disagreed, stating that

in section 115--10.1 the legislature expressly enumerated the

circumstances it concluded would indicate a prior inconsistent

statement was reliable.  Carlos, 275 Ill. App. 3d at 84; see also

People v. Fauber, 266 Ill. App. 3d 381, 391 (1994).  Similarly, in

the case at bar Pursley argues that the court should have made a

determination that Crabtree's statements were voluntary, even

though the statements met the Code's requirements.  We decline to

adopt the defendant's argument.    

     Pursley points this court to People v. Johnson, 255 Ill. App.

3d 547 (1993), to show that a determination of voluntariness is

required in addition to meeting the requirements of section 115--

10.1.  In Johnson, the Appellate Court, First District, stated that

it would violate the defendant's due process rights to admit a

prior inconsistent statement, even if the statement met section

115--10.1's requirements, unless an evidentiary basis that the

statement was voluntary and reliable was established.  Johnson, 255

Ill. App. 3d at 558.  Accordingly, the court noted that, before a

prior inconsistent statement is admissible for constitutional

purposes, the trial court must find that there is a sufficient

evidentiary basis from which a jury could find that the declarant's

prior statements were knowing and voluntary.  Johnson, 255 Ill.

App. 3d at 559.  

     When determining whether the declarant's prior inconsistent

statements were voluntary in the case before it, the Johnson court

explained that the State presented evidence that the declarant

signed a statement and that the declarant voluntarily testified

before the grand jury.  Consequently, the court determined that

there was a sufficient reliable basis for the admission of the

prior statements.  This analysis, however, is exactly the same as

section 115--10.1 requires.  Indeed, as the Carlos court noted, the

legislature determined what would constitute reliability when

drafting section 115--10.1.  Therefore, a finding of reliability

and voluntariness is automatically made by concluding that a prior

statement meets section 115--10.1's test.  Accordingly, no

additional analysis is needed.  Certainly, even the Johnson court

agrees that it is the jury's decision to assign weight to the

statement and to decide if the statement was indeed voluntary,

after hearing the declarant's inconsistent testimony.  See Johnson,

255 Ill. App. 3d at 559.  As a result, we agree with the Appellate

Court, Fourth District that if a prior inconsistent statement meets

section 115--10.1's requirements it may be admitted into evidence

without an independent determination of its voluntariness.  

     Pursley's fourth contention is that the State failed to prove

beyond a reasonable doubt that he murdered Asher.  Pursley argues

that he had an unimpeached alibi defense, Bodell observed a man

with different physical characteristics hiding near the scene,

Crabtree testified that her previous statements were untrue,

Windham's testimony was not credible, and the State's ballistic

expert was contradicted by another ballistics expert.  We disagree. 

It is the jury's function to determine the accused's guilt or

innocence, and this court will not reverse a conviction unless the

evidence is so improbable as to justify a reasonable doubt of

defendant's guilt.  People v. Frieberg, 147 Ill. 2d 326, 359

(1992).  Indeed, the relevant question is whether, after viewing

the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.  Frieberg, 147 Ill. 2d at 360. 

A conflict in the evidence does not establish a reasonable doubt,

and a jury verdict based on substantial and credible evidence is

not rendered reversible by the fact that other evidence was

introduced which might, if believed, have resulted in a different

verdict.  People v. Mendoza, 208 Ill. App. 3d 183, 204 (1991). 

Instead, only where the record leaves the reviewing court with a

grave and substantial doubt of guilt should the conviction be

reversed.  Mendoza, 208 Ill. App. 3d at 204.

     In the present case, the evidence was sufficient to prove

Pursley guilty beyond a reasonable doubt.  The jury chose to

believe the State's evidence, and we do not find that the testimony

of Bunnell, Crabtree, and Pursley's ballistics expert raises a

substantial doubt of guilt such that a reversal of Pursley's

conviction is warranted.  

     Although Crabtree testified that she lied in her police

statement and before the grand jury, the jury could have reasonably

believed that she had previously told the truth and was lying at

the trial.  Similarly, although Aaron and Anthony testified that

they were with Pursley on April 2 and that he did not leave the

house, they also admitted that they had told the police

investigators a different version of April 2 just two weeks before

the trial.  Moreover, both Aaron and Anthony repeatedly stated that

they thought that they had visited Pursley on a Saturday.  The jury

could have reasonably believed that the children had confused the

dates and that they were not with Pursley on Friday, April 2.

     The same inferences can be made regarding Bodell's testimony

and Windham's testimony.  Although the defendant states that

Windham's criminal history and the reward money motivated him to

create a story implicating Pursley in the murder, the jury could

have reasonably believed that he was telling the truth concerning

his meeting with the defendant.  Additionally, Bodell's testimony

contradicted what he told the police immediately after the murder,

and the jury could have reasonably believed he was mistaken about

the distance from his garage to where he saw a man hiding from the

police.  Finally, it is immaterial that the defense's ballistics

expert contradicted the State's expert.  It is settled law that the

trier of fact has the duty to resolve contradictory expert

testimony.  People v. Horne, 247 Ill. App. 3d 192, 198 (1993). 

Therefore, we find that the State did prove Pursley guilty of

Asher's murder beyond a reasonable doubt.

     Finally, Pursley erroneously contends that his sentence of

natural life imprisonment is excessive.  A reviewing court may

alter the sentencing judge's disposition only upon a finding of

abuse of discretion.  People v. Cox, 82 Ill. 2d 268, 275 (1980).  

Numerous witnesses testified for Pursley at the sentencing hearing. 

After all the testimony was heard, the court noted that the defense 

presented testimony that showed Pursley to be intelligent, capable

of forming and nurturing loving relationships, and that he had made

efforts to further his education.  The court stated that, even with

the mitigating factors, the court's responsibility was to weigh the

mitigating and the aggravating factors and to balance them.  The

court explained that, because of some of the unusual facts and

circumstances of the case, it would decline to impose the death

penalty.  The court added that although Pursley had good qualities

it believed that the defendant, due to his criminal record, was a

menace to society.  Accordingly, the court sentenced Pursley to

life imprisonment without parole.

     After our review of the record, we conclude that the court did

not abuse its discretion in imposing this sentence.  Indeed, the

court balanced the mitigating factors with the defendant's criminal

history.  Moreover, the record shows that the court carefully

considered the mitigating factors, and these factors played an

essential role in not sentencing Pursley to death.  Therefore, we

find that Pursley's sentence is not excessive.

     For the foregoing reasons, the judgment of the circuit court

of Winnebago County is affirmed.

     Affirmed.

     DOYLE and HUTCHINSON, JJ., concur.